UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS MENDOZA,<br><br>    Petitioner,<br><br>    v.<br><br>JEFFREY BEARD,<br><br>    Respondent. | No. 2:98-cv-02150 MCE GGH P<br><br>FINDINGS & RECOMMENDATIONS |

*Introduction*

    Petitioner, a state prisoner proceeding through counsel, has filed an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. ECF No. 24. The matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 626(b)(1) and Local Rule 302.

    Petitioner challenges his 1995 conviction for two counts of first degree murder, two counts of attempted and premeditated murder, and the jury's finding of multiple murder special circumstances as true. Respondent has filed an answer to petitioner's single claim for relief based on insufficient evidence, and petitioner has filed a reply. ECF Nos. 75, 76. For the reasons that follow, the undersigned recommends this petition be denied.

*Procedural Background*

    On February 14, 1995, petitioner was convicted by jury trial in San Joaquin County Superior Court of two counts of first degree murder under Cal. Penal Code § 187, two counts of

1

attempted first degree murder under Cal. Penal Code §§ 187/664. ECF No. 77-3 at 294; 207-215. The jury also found true multiple murder special circumstances. Id. Petitioner was sentenced to a term of life imprisonment without the possibility of parole. ECF No. 77-3 at 294. On April 24, 1997, the California Court of Appeal, Third Appellate District affirmed the judgment. ECF No. 78-9. A petition for review with the California Supreme Court was denied on August 13, 1997. ECF No. 78-11.

Petitioner initially filed a mixed federal habeas petition in this court on October 30, 1998. ECF No. 1. On January 27, 2000, petitioner filed an amended petition which is the operative petition in this case. ECF No. 24. On February 9, 2000, in relevant part, the undersigned issued findings and recommendations recommending granting petitioner's motion to hold proceedings in abeyance while petitioner returned to state court to exhaust new claims, which the district court adopted in full on May 8, 2000. ECF Nos. 25, 29.

*Fourteen years later*, on November 4, 2014, respondent filed a motion to lift the stay and motion to dismiss for lack of prosecution pursuant to Fed. R. Civ. P. 41(b). ECF No. 34. On November 21, 2014, the undersigned granted respondent's motion to lift the stay and reopened the case. ECF No. 35. The court further provided petitioner an opportunity to file a response to petitioner's motion to dismiss. Id. Petitioner's counsel at the time, Denise Kendall, filed a response and requested that new counsel be appointed in light of her conflict of interest. ECF No. 36. On January 7, 2015, the court granted petitioner's request and ordered the Federal Defender to accept appointment as counsel or designate appointment of new counsel. ECF No. 38. On February 9, 2015, the undersigned ordered the Federal Defender to show cause for failure to respond to the court's January 7, 2015 order. ECF No. 39. Following the Federal Defender's response, ECF No. 40, new counsel was appointed. ECF No. 43. Benjamin Ramos, petitioner's new counsel, was ordered to file an opposition to respondent's motion to dismiss, which was filed on March 12, 2015. ECF Nos. 44, 45. On April 14, 2015, the undersigned issued findings and recommendations recommending that respondent's motion to dismiss be granted for failure to prosecute, which the district court adopted in full on June 12, 2015. ECF Nos. 46, 62. After a successful appeal in the Ninth Circuit Court of Appeals, the district court was ordered to allow

petitioner to proceed with the operative amended petition. ECF No. 70. In light of the Ninth Circuit's decision, the undersigned ordered the Clerk of the Court to reopen the case; reserve the amended petition on respondent; and directed the respondent to file an answer within the relevant deadline, which respondent did so on February 24, 2017. ECF No. 74, 75.

*Factual Background*

The court has conducted a thorough review of the record in this case, as well as the California Court of Appeal, Third Appellate District's unpublished memorandum and opinion affirming petitioner's judgment of conviction on direct appeal. The appellate court's summary of the facts is consistent with the court's own review of the record. Accordingly, it is provided below:

> A jury convicted defendants Luis and Pedro Mendoza of first degree murder of Rudy Martinez (count I) and Ernesto Arranda (count II) (Pen. Code, § 187; further statutory references to sections of an undesignated code are to the Penal Code), and of attempted, deliberate and premeditated murder of Davis Ruiz (count III) and Steven Carrillo (count IV). (§§ 664/187, subd. (a).) The jury found true the charged multiple murder special circumstance. (§ 190.2, subd. (a) (3).) Both defendants were sentenced to state prison for life without the possibility of parole.
>
> Charter Way is a major thoroughfare in South Stockton. Charter Way is also the claimed territory of the "Nortenos," a street gang based primarily in Northern California. Although defendants claimed to have no gang affiliation, two of the victims, Steven Carrillo and Davis Ruiz, testified defendants were members of the rival "Surrenos," a street gang based primarily in Southern California.
>
> Late in the evening of February 27, 1993, defendant Pedro Mendoza (Mendoza), was driving his Buick on Charter Way. A friend, Anthony Perez, was in the front passenger seat. Mendoza's brother, defendant Luis Mendoza (Luis Mendoza), was in the back seat along with another friend, Rene Rodriguez.[1] At the same time, admitted Norteno gang members and the victims in this case, Rudy Martinez, Davis Ruiz, Steven Carrillo, and Ernesto Arranda, were in a car

---

[1] [Fn. 1 in original] The defendants and their associates will be referred to individually by their surnames except that Luis Mendoza will be referred to individually as "Luis Mendoza" to distinguish him from the other defendant, his brother, Pedro, who will be referred to individually as "Mendoza." The Mendozas, collectively, will be referred to as "defendants" or as "the Mendozas." Rodriguez's brother, Edward, is also a member of the dramatis personae. To distinguish him from the first appearing Rodriguez, Rene, who will throughout be referred to as "Rodriguez," Edward will be referred to as "Edward Rodriguez." Rene and Edward will be referred to collectively as the Rodriguezes.

driving on Charter Way.[2] The Nortenos spotted Mendoza's car. Martinez flashed his high beams and followed Mendoza as he pulled into a Shell station.

In the station, Carrillo and Arranda challenged Mendoza to fight. Luis Mendoza, believing the Nortenos were armed, urged his brother not to fight and Mendoza declined the challenge. Rodriguez observed Arranda with a handgun and told Mendoza to "[t]ake off." As Mendoza drove away, Arranda fired, striking the back of the Buick.

A high speed chase ensued but eventually Mendoza pulled away from Martinez. Mendoza drove to his residence on Pock Lane and parked in the back so his car could not be seen from the street. Within three-to-four minutes, the Nortenos drove past the residence and made a U-turn. When the Nortenos drew in front of defendants' residence, Arranda fired a shot from the vehicle. The Nortenos then drove away.

Mendoza got a shotgun from the house. In the meantime, Luis Mendoza got in the driver's seat of a green Monte Carlo, while Rodriguez and Perez got into the back seat. Petitioner got into the front passenger seat and the group drove back to Charter Way.

According to Rodriguez, Mendoza was angry and upset. According to Perez, Mendoza stated he wanted to "get those dudes." Mendoza himself later admitted he wanted to kill the Nortenos so they would not bother him or his family again. Rodriguez and Perez were afraid and asked several times to be taken home. Defendants ignored these requests and continued looking for Martinez's vehicle.

Perez observed Martinez's vehicle on Charter Way. Luis Mendoza pulled in behind Martinez, who was stopped in a left turn lane. Perez again asked to be taken home, and again his request was ignored. When the light changed to green, Luis Mendoza followed Martinez's vehicle as it made a left turn onto Center Street. With Mendoza providing directions, Luis Mendoza pulled alongside Martinez's vehicle. Mendoza twice told Luis Mendoza to slow down. Mendoza then leaned out the front passenger window, aimed his shotgun and fired. The blast struck Martinez in the head. Immediately, Martinez lost control of his vehicle and it crashed into a fence.[3]

Luis Mendoza put his car in reverse and, with the tires squealing, returned to the site of the crash. Carrillo and Ruiz, who were in the back seat of Martinez's vehicle, tried to get out of the vehicle but were unable to do so. They tried to hide in the back seat.

Defendants waited inside their car for a "little while." Then, at Luis Mendoza's urging, Mendoza got out of the car. The two Mendozas walked up to the crashed vehicle. Mendoza placed his arm through

---

[2] [Fn. 2 in original] The victims will be referred to individually by their surnames and collectively as "the Nortenos."

[3] [Fn.1 in original] The shotgun blast had "blown off" the side of Martinez's face.

4

the driver's side window and fired the shotgun twice at point blank range at Arranda, who was sitting in the front passenger seat. Mendoza then shot twice into the back seat where Carrillo and Ruiz were hiding. The two Mendozas returned to the Monte Carlo and Luis Mendoza drove away.

They drove to the house of Rodriguez's brother, Edward Rodriguez. Once inside, Mendoza handed the shotgun to Edward Rodriguez and asked him to keep it. Mendoza stated he knew he had killed the driver (Martinez) because the driver's face had been "[p]eeled off." Perez recalled Mendoza saying he thought he killed everyone in the vehicle. Luis Mendoza said he thought one person in the back seat might still be alive. Perez was the only one with a valid driver's license. To minimize the chances of detection in the event the vehicle was stopped, Perez drove everyone home in Edward Rodriguez's vehicle.

In the meantime, Carrillo and Ruiz managed to get out of Martinez's vehicle by crawling out the driver's side window. Ruiz had been shot in the left shoulder and back. Carrillo had been struck by shotgun pellets and was bleeding.

When police arrived at the site of the crash, Martinez was dead. Arranda was taken to a hospital where he died from his injuries.

Three expended shotgun shells were found inside Martinez's vehicle, and another shell was discovered under the rear left fender of the vehicle. An autopsy of Martinez disclosed he had suffered a fatal shotgun wound to his forehead near the left eye, causing extensive brain injury. The shot cup from the expended shell was found in the anterior brain. A criminalist testified that based upon the pellet spread and blood splatter evidence, Martinez was shot at a downward angle from a position slightly behind and at a distance probably less than six feet.

Arranda suffered numerous wounds to the abdomen and contiguous areas. The cause of death was a shotgun wound to his trunk. The wounds were so close in contact the shot cups from the expended shells were discovered intact inside Arranda's body. The criminalist concluded Arranda was shot from a distance of less than two feet.

The earlier, precipitating incident at the Shell station was not the first confrontation between defendants and the Nortenos. Some 18 months earlier, in August 1991, Mendoza and Edward Rodriguez were cruising on Charter Way armed with a loaded .380 caliber semi-automatic handgun. As they passed a Taco Bell restaurant, Arranda yelled at them, "fucking scraps."[4] They returned to the Taco Bell, ostensibly to deny any gang affiliation. They pulled up next to the Taco Bell where Arranda, Carrillo, and another Norteno member, Elias Gonzalez, stood. Gonzalez and Carrillo, each carrying a large bottle of beer, approached their vehicle. Edward Rodriguez told the

---

[4] [Fn. 4 in original] The term "scrap" is a derogatory term for a Surreno street gang member. A "fucking scarp" is worse even than a "scrap."

5

Nortenos that he and Mendoza were not gang members. Gonzalez saw the handgun resting on Mendoza's lap and asked about the weapon. Edward Rodriguez replied it was for protection. When Mendoza reached for the gun, Gonzalez broke a beer bottle over his face, cutting and breaking his nose and causing it to bleed profusely. A second beer bottle was thrown into the vehicle, striking Edward Rodriguez on the head.

Mendoza fired the handgun and the Nortenos responded in kind. Edward Rodriguez drove away. Both Gonzalez and Carrillo were injured in the shoot-out (the "Taco Bell" incident).

The following day, Edward Rodriguez's house was the target of a drive-by shooting. He returned the gunfire. He believed Arranda had been in the vehicle during the drive-by and informed Mendoza of the incident.

A few weeks after the Taco Bell incident, Mendoza and the Rodriguez brothers, Edward and Rene, were again driving on Charter Way. As they pulled into an AM-PM gas station, a vehicle pulled alongside. The occupants of the vehicle wore red (the Norteno color) and stared hard at Mendoza and the Rodriguez brothers. As the vehicle drove away, shots were fired from that vehicle at Mendoza and the Rodriguezes. Mendoza returned the gunfire, but apparently did not shoot fast enough. Edward Rodriguez grabbed the gun out of Mendoza's hand and fired at the other vehicle. Neither Mendoza nor the Rodriguezes reported this incident (the "AM-PM" incident) to the police.

Luis Mendoza did not testify. Mendoza testified and denied he had ever been a member of a gang. He also claimed he had been harassed, threatened and shot at over a two-year period preceding the Shell station incident.

With regard to the train of events which began at the Shell station, Mendoza claimed he pulled into the station in response to Perez's suggestion to see what the Nortenos wanted. After declining the Nortenos' invitation to fight, Mendoza drove away when Arranda was observed with a handgun. The rear of Mendoza's car was struck by a bullet as he drove away from the station.

A high speed chase ensued, but Mendoza believed he had lost the Nortenos. Mendoza returned to his Pock Street residence and parked his car behind the house so it would not be seen from the street.

Suddenly, the Nortenos passed by, made a U-turn, and fired a shot from the car when it again passed by Mendoza's home. Mendoza worried his family was in danger because the Nortenos now knew where he lived. Mendoza went to his room, got the shotgun, and loaded it.

Mendoza testified the group took the Monte Carlo so they would not be recognized by the Nortenos. He also recalled that Perez and Rodriguez asked to be taken home. Mendoza denied that when he and his group left in the Monte Carlo, there was any plan much less

6

any discussion regarding finding the Nortenos and shooting them. Once on Charter Way they found themselves by chance behind the Nortenos' vehicle and followed it.

Luis Mendoza pulled alongside the Nortenos' vehicle. Mendoza thought he had been spotted by the front seat passenger, Arranda, and that Arranda was reaching for a gun. Mendoza fired at Martinez's vehicle. The blast struck Martinez and his car crashed into a fence.

Mendoza approached the crashed vehicle on foot. He had no plan to shoot at the victims again. In fact, he had no explanation as to why he approached the Nortenos' crashed vehicle. However, once he was at Martinez's car, he saw Arranda reaching for a gun and shot him. He reacted to movement in the back seat and fired in that direction. He fired again into the front and back seats. He heard his companions calling to him and returned to the Monte Carlo. The group then drove to Edward Rodriguez's house, where Mendoza dropped off the shotgun.

Mendoza denied he was proud that he had shot the victims. He claimed the shootings were necessary. He feared the Nortenos would harm his family because they had harassed him previously and earlier that night had shot at him at the Shell station and again at his home.

Mendoza testified he did not call the police after the shot was fired at his home because he believed it would make matters worse. Also, he did not have the license plate number of Martinez's vehicle.

Mendoza testified that he was lying when he told the police he intended to kill the Nortenos following the Shell station incident.

With regard to the Taco Bell incident, Mendoza testified he and Edward Rodriguez approached the Nortenos only to inform them they were not gang members. When he was struck by the beer bottle, the handgun was out of sight inside the glove compartment. He fired the gun only in response to being fired upon by the Nortenos.

Regarding the AM-PM incident, Mendoza denied firing any shots at the Nortenos. He testified Edward Rodriguez fired the handgun, but only after having been first fired upon by the Nortenos.

Finally, Mendoza testified to another confrontation which occurred even before the Taco Bell incident. He claimed that he, Luis Mendoza, the Rodriguez brothers and Perez were the victims of a drive-by shooting on Pacific Avenue (the "Pacific Avenue" incident). He claimed the shooters were the same Nortenos involved in the Taco Bell, AM-PM, etc., incidents.

ECF No. 78-9 at 1-10.

*Legal Standard of Review*

The statutory limitations of a federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

7

Effective Death Penalty Act of 1996 ("AEDPA"). The text of § 2254 provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has held and reconfirmed "that § 2254(d) does not requires a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington v. Richter, 562 U.S. 86, 98 (2011). Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 99 (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows: "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Harrington, supra, at 101 (citing Williams v. Taylor, 529 U.S. 362, 410 (2000)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Id. at 101 (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

Accordingly, "a habeas court must determine what arguments or theories supported or…could have supported [] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the

8

holding in a prior decision of this Court." Id. at 102. "Evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Id. Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).)

The undersigned also finds that the same deference is paid to the factual determinations of state courts. Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." It makes no sense to interpret "unreasonable" in §2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court's factual determination. A petitioner must show clearly and convincingly that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19 (2002). Specifically, the petitioner "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, supra, at 102. "Clearly established" law is law that has been "squarely addressed" by the United States Supreme Court. Wright v. Van Patten, 552 U.S. 120, 125 (2008). Thus, extrapolations of settled law to unique situations will not qualify as clearly established. See, e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

9

The established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. 3, 9 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Id. at 8. Where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record regarding that issue. Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA deference is given; instead the issue is reviewed de novo under general principles of federal law. Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2012). However, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013).

*Discussion*

As his single claim for relief, petitioner alleges there was insufficient evidence of premeditation and deliberation to support his convictions for first degree murder and attempted premeditated, deliberate murder. ECF No. 24 at 13. Petitioner contends that the evidence instead establishes he acted in a heat of passion, or in the alternative, negates a finding of premeditation and deliberation, thereby entitling him to lesser offenses of manslaughter and attempted manslaughter, or in the alternative, second degree murder and attempted second degree murder. Id. Petitioner presented this claim on direct appeal to the California Court of Appeal. ECF No. 78-9.

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of

the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Jackson established a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010). First, the court considers the evidence at trial in the light most favorable to the prosecution. Id. (citing Jackson, 443 U.S. at 319.) "'[W]hen faced with a record of historical facts that supports conflicting inferences,' a reviewing court 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Id. (quoting Jackson, 443 U.S. at 326.)

"Second, after viewing the evidence in the light most favorable to the prosecution, a reviewing court must determine whether this evidence, so viewed is adequate to allow 'any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson, 443 U.S. at 319.) "At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt." Id.

Put another way, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011). Sufficiency of the evidence claims in federal habeas proceedings must be measured with reference to substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n. 16.

"Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 566 U.S. 650, 655 (2012) (internal quotation marks and citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate

11

court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005). Because this claim is governed by the AEDPA, this court owes a "double dose of deference" to the decision of the state court. Long v. Johnson, 736 F.3d 891, 896 (9th Cir. 2013) (quoting Boyer v. Belleque, 659 F.3d 957, 960 (9th Cir. 2011)).

The California Court of Appeal denied this claim as follows:

> On appeal Luis Mendoza argues that as heat of passion was established "as a matter of law," his convictions should be reduced to manslaughter and attempted manslaughter. Luis Mendoza also claims that if heat of passion was not established as a matter of law, the evidence of such negated a finding of premeditation and deliberation, "requiring reduction of the murder convictions to ones in the second degree and striking the findings of premeditation and deliberation on the attempted murders." Essentially, Luis Mendoza argues there is no substantial evidence to support his convictions of first degree murder and attempted murder via premeditation and deliberation.
>
> "To determine sufficiency of the evidence, one examines whether a rational trier of fact could find defendant guilty beyond a reasonable doubt. In this process on must view the evidence in the light most favorable to the judgment and presume in favor of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. To be sufficient, evidence of each of the essential elements of the crime must be substantial and one must resolve the question of sufficiency in light of the record as a whole." (*People v. Hernandez* (1988) 47 Cal.3d 315, 345-346.) When the evidence is sufficient to justify a reasonable inference the requisite intent existed, the jury's finding of that intent will not be disturbed on appeal. (*People v. Ferrell* (1980) 218 Cal.App.3d 828, 834.)
>
> We shall not reiterate all the details of the Shell station incident and the events immediately following which culminated in the murders of Martinez and Arranda and the attempt murders of Ruiz and Carrillo. Suffice it to say there is substantial evidence to support the jury's verdicts of first degree murder of Martinez and Arranda, and the attempted murder of Ruiz and Carrillo by deliberation and premeditation.
>
> Rather than simply driving away when the Nortenos flashed their lights at Mendoza's vehicle, Mendoza decided to "see what they want" and pulled into the Shell station. Thus, like the Taco Bell incident some 18 months earlier, Mendoza made a conscious decision to engage the Nortenos on their turf.
>
> Admittedly, the Nortenos were the aggressors at the Shell station and immediately thereafter, when they pursued defendants back to the Pock Street residence. There is no question, however, that after the drive-by shooting at the Pock Street residence, defendants became

the aggressors. Moreover, there is evidence from which the jurors could draw an inference that even before the Nortenos shot at the Pock Street residence, defendants had already formulated a plan to pursue and kill the Nortenos. Perez testified that even before the drive-by shooting of defendants' residence, Luis Mendoza had entered and started the Monte Carlo and Mendoza was inside the house. Both Rodriguez and Perez told the police that prior to the drive-by shooting, Mendoza had already gone inside the house. From this evidence, the jury could infer the defendants had decided prior to their return to the Pock Street residence to change cars to gain the advantage of surprise and to pursue the Nortenos and wreak violence upon them. Following his arrest, Mendoza told the police that at the time he got the shotgun from his house, he intended to kill the victims. This is substantial evidence of premeditation and deliberation.

The cold-blooded manner of the killings speaks to the elements of premeditation and deliberation. Defendants left Pock Street in a different car to gain the advantage of surprise in finding and confronting the Nortenos. Once defendants spotted the Nortenos' car, they followed it. Mendoza directed Luis Mendoza how to maneuver the vehicle to give him a clear shot at Martinez, first telling him to move into the adjoining lane, then to pull up alongside the Nortenos' car, and then to slow down. At that point, Mendoza leaned outside the window and fired a single shot, striking Martinez in the head and causing him to lose control of the vehicle, which crashed immediately thereafter.

Defendants could have driven away. Instead, they backed up to the scene of the accident. After waiting "a little while" in the car, Luis Mendoza directed Mendoza get out of the car. He complied and both walked up to the Nortenos' car, where Mendoza pointed the shotgun inside the window and fired twice at Arranda at point-blank range. He then fired twice into the back seat, striking Ruiz in the arm and practically severing it from the shoulder.

Luis Mendoza argues this is a classic case of manslaughter. He notes that within minutes of being fired upon at the Shell station, pursued in a high-speed chase, and then fired upon again at his home, the defendants, along with Rodriguez and Perez got into "another car and met up with their attackers scant minutes later. [T]his is an almost textbook scenario for heat of passion."

Assuming a reasonable jury could have found defendants acted in the heat of passion in pursuing and shooting the victims, where there is substantial evidence supporting a finding of malice and premeditation, reversal is not warranted simply because this same evidence might also be reconciled with a verdict of voluntary manslaughter. (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1213.)

Mendoza testified he fired at the Nortenos only in response to seeing movement by Arranda which suggested Arranda was reaching for a gun. Carrillo testified there was no movement in the Nortenos' vehicle prior to the shot that killed Martinez. Mendoza's claim he

13

fired only in response to movement by Arranda is also undermined by the fact his window was already down when he claimed to have spotted the movement, notwithstanding it was late evening in February.

Mendoza testified he did not aim at Martinez, but simply fired a shot at the Nortenos' vehicle. Yet his single, "unaimed" shot was a close-range, direct hit, striking Martinez in the head.

Mendoza could not explain why he approached the Nortenos' crashed vehicle on foot, but testified he did not approach the car with the intent to shoot. Yet, that is precisely what he did, and at point blank range. The jury was not required to accept his naked assertion he lacked intent when the evidence strongly suggests the contrary.

Aside from Mendoza's trial testimony, there were other facts which contradicted defendants' claim they were innocent victims caught in the web of gang violence. Both Mendozas lied repeatedly to the police, first denying any involvement in the shootings of the Nortenos, then denying they had discussed going after the Nortenos following the Shell station incident. Luis Mendoza admitted subsequently there had been a discussion about pursuing the Nortenos, but only to scare them so they would not bother the Mendozas again. Luis Mendoza then admitted he and his brother in fact discussed going after and killing the Nortenos.

Finally, defendants' claim of heat of passion and provocation was based almost entirely on the fact they deemed a quick response imperative because the Nortenos, having followed defendants back to their residence following the Shell station incident, now knew where defendants and their family lived, placing the family in jeopardy. The jury was not required to accept this claim at face value. First, there is nothing in the record which suggests that prior to the Shell station incident, the Nortenos did not know, or could not have found out, where defendants lived. Second, Edward Rodriguez's house had been the site of a drive-by shooting on the day following the Taco bell incident, i.e., some 18 months earlier, and he informed Mendoza of the shooting. Yet, nothing suggests either Edward Rodriguez or Mendoza deemed the fact the Nortenos knew where the former lived to be of such significance that an instant and lethal response was necessary. Third, Mendoza testified that within two days of the Shell station incident, he was aware Carrillo and Ruiz had survived the attack. Yet, even though defendants were not arrested until almost two weeks later, they never informed their family, whose welfare they were ostensibly so concerned about, of the need to be cautious or of the possibility the family might be the victim of further drive-by shootings.

It was for the jury to determine from all of the evidence which crimes, if any, defendants were guilty of committing. The jury rejected both voluntary manslaughter and second degree murder and found first degree murder and attempted murder with premeditation and deliberation. It is not within the province of this court to reverse any judgment on the ground of insufficient evidence unless it clearly appears "that upon no hypothesis whatever is there sufficient

> substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) There is substantial evidence of a deliberate and premeditated plan to ambush the victims and then to execute them.

ECF No. 78-9 at 10-16.

The California Court of Appeal's rejection of petitioner's claim is reasonable. According to the evidence, petitioner admitted it was his idea to switch cars so that they would not recognized after the Nortenos drive-by at petitioner's place of residence; petitioner drove the car to search for the Nortenos; after they had located their assailants' car, petitioner followed Pedros's directional instructions to obtain a good head-shot, and Pedro Mendoza shot the Norteno driver in the face resulting in the Nortenos car crashing; petitioner stopped and reversed their car to where the Nortenos' car had crashed; petitioner admitted that he "waited a little while" in the car prior to getting out to look at the Nortenos' car where his brother later fired more shots into the Nortenos' car. Petitioner had further later admitted that there was a discussion about "killing these guys" prior to leaving to search for the Nortenos. Even if it was true that petitioner's actions were out of fear and anger after the initial drive-by that was committed by the Nortenos, there was sufficient evidence for the jury to discredit or reject petitioner's credibility or theories of defense. Viewing the evidence in the light most favorable to the prosecution, a rational jurist could have reasonably found a strong inference of premeditation and deliberation pursuant to Cal. Penal Code §§ 187, 188. Moreover, whether there is evidence supporting a lesser offense, is immaterial:

> **[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.** A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state decision rejecting a sufficiency of the evidence challenge simply because the federal court disagree with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'

Cavazos v. Smith, 565 U.S. 1, 2 (2011) (citation omitted) (emphasis added). Here, the jury was presented with evidence and instructions based on petitioner's heat of passion and imperfect self-defense theories, where they considered such theories and ultimately rejected them. It is not clear that the California Court of Appeal erred here, "much less erred so transparently that no

15

fairminded jurist could agree with that court's decision." Bobby v. Dixon, 565 U.S. 23, 24 (2011).

Accordingly, petitioner fails to show the California Court of Appeal's decision is contrary to or involved an unreasonable application of federal law, as required pursuant to 28 U.S.C. 2254(d). The undersigned recommends that petitioner's claim be denied.

*Certificate of Appealability*

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

*Conclusion*

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Petitioner's amended petition for writ of habeas corpus (ECF No. 24) be denied; and
2. The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: March 18, 2019

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE